COMMONWEALTH *vs.* STEPHEN H. MURPHY.

Hampshire.   November 3, 1969. — January 20, 1970.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & REARDON, JJ.

*Error,* Whether error harmful. *Evidence,* General objection to admission of evidence, Photograph, Autopsy, Relevancy and materiality, Res gestae, Judicial discretion, Exhibit, Admissions and confessions, Telephone conversation. *Homicide. Arson.*

At the trial of a college student for murder in the first degree of a fellow student and arson committed in the defendant's room in a rooming house, there was no error in the circumstances in the admission of testimony, introduced without objection, of the chief of the fire department that the wallet of the deceased found at the scene of the crimes contained no money [607–608]; or in the admission of testimony

of a policer officer who attended an autopsy on the deceased that he saw the pathologist fit a hammer found in the defendant's room into indentations in the deceased's skull [608]; or in the showing of graphic and gruesome colored slides of the deceased's body which were made during the autopsy and fairly represented what the pathologist encountered and which were not admitted in evidence [608–609]; or in the admission of testimony of another fellow student that after the deceased had been pulled from the defendant's room but before a fire there had been brought under control the witness told police there that two persons had been in the room [609–610]; or in the admission of various photographs depicting the scene of the crimes, or exhibits found there [610].

At a trial for serious crimes committed in Massachusetts, any error in the admission after a voir dire of testimony by one well able to recognize the defendant's voice that on the day following commission of the crimes a telephone operator told the witness there was a call for her daughter from a city in a southern State, and that when the operator "immediately" relayed the message that the daughter was not at home, the witness recognized the defendant's voice, was harmless where there was evidence that on the day following the telephone call the defendant, upon his arrival in Massachusetts and when asked where he had been, stated that he had "headed south." [610–611]

Evidence at the trial of a college student for murder in the first degree of a fellow student and for arson in a rooming house in which they resided showed to a reasonable and moral certainty that the defendant, and no one else, committed the crimes with which he was charged, and warranted his conviction. [612]

At the trial of an indictment for arson of the premises of a named person, there was no error in the admission in evidence of a deed to establish ownership thereof. [612]

Two INDICTMENTS found and returned in the Superior Court on June 8, 1967.

The cases were tried before *Macaulay*, J.

*John F. Foley (Stephen R. Kaplan* with him) for the defendant.

*Oscar Grife*, District Attorney, for the Commonwealth.

REARDON, J.  The defendant was indicted for and found guilty of murder in the first degree of George W. Rollins, and arson of the property of Lewis J. Payton. There was a recommendation by the jury that the death sentence not be imposed. A trial was held on the indictments pursuant to the provisions of G. L. c. 278, §§ 33A–33G. The defendant's appeals are here on a transcript of the evidence, a summary of the records, and assignments of

error. The assignments on each indictment are similar
save for an additional assignment relating to the indictment
for arson and, hence, except for that assignment, the other
assignments will be considered together.

Evidence was as follows. On March 23, 1967, the date
of the alleged crime, the defendant, an undergraduate at
the University of Massachusetts, resided on the first floor
of a rooming house in Amherst in a room adjoining that
occupied by Sang Seek Park, a graduate student at the same
university. They shared a common kitchen. A door sepa-
rated the rooms of Park and the defendant. On the same
floor in another room lived George W. Rollins. On the
evening of March 22, after he had visited the defendant and
Rollins together in Rollins's room about 8 P.M., Park went
to the moving pictures, arriving back sometime between
11 and 11:30 P.M. After a visit to the kitchen he again
joined the defendant and Rollins in the defendant's room.
He eventually left between 12:30 and 1 A.M. and, returning
to his own room, could hear voices in the defendant's room
for a period of between a half hour and an hour. Whether
these were live voices or voices coming from a tape record-
ing in the defendant's room he could not tell. At some
time which Park placed between 12:30 and 1 A.M. (this now
being March 23), the defendant appeared in the doorway
connecting his room with that of Park and asked Park if he
were going to bed, to which Park responded in the negative.
At 1:45 A.M. one Priscilla H. Kelley received a telephone call
from Rollins. About 2 A.M. her husband called back to a
telephone shared by the defendant and Park, and Rollins
answered the telephone. While talking with Rollins Kelley
heard another male voice on Rollins's end of the line.
Sometime later Park heard a muffled "poof" and a voice
which sounded like Rollins saying, "Steve, Steve." Park
called out Rollins's name, heard no response, and then
noticed smoke coming through the door. He went into the
hallway, found it full of smoke, went back to his room, put
on his coat and set off for the police station which took him
three to five minutes to reach. He there reported a fire to

an officer on duty who summoned the Amherst fire department and a doctor. A police cruiser arrived on the scene. An officer, finding heavy smoke in the hallway, kicked open the door to the defendant's room. Crawling into the room he found the body of Rollins lying on the floor with his head some four feet from the door. In company with a second officer he pulled Rollins into the hallway and then onto the porch. The officers did not see the defendant during this period. Officer Southwick, who was the first officer to enter the room, observed, after the fire was out, burned bedding in the middle of the room, two one gallon cans of paint thinner against one wall with their caps off, both being practically empty, and a half-empty bottle marked "acetone" behind a doorway. Officer Mitchell, who also entered the room, found a partially burned hammer which "appeared to be like a mason's hammer" in the bedding. There was testimony from the Amherst fire chief and an officer from the State Fire Marshal's office that the fire was not accidental. The doctor who had been summoned found Rollins bleeding from head wounds. Another doctor at a hospital in Northampton stated that Rollins was covered with blood and that he had sustained severe facial and multiple skull lacerations. In addition to the "crushing-type injuries" he received, Rollins was burned over sixty per cent of his body by thermal burns caused by intense heat. A pathologist testified that the injuries he observed on Rollins's body were consistent with the use of a hammer of the type found in the defendant's room. Rollins was removed from the Northampton hospital to the Massachusetts General Hospital in Boston where he died on April 7, 1967. Endeavors made to locate the defendant in Northampton or Amherst immediately following this occurrence were fruitless but he was arrested at the Lexington police station on March 25, 1967. Other evidence pertinent to the disposition of this case will be adverted to in the treatment of the various assignment's of error.

1. We see no merit in the defendant's first assignment in which he contends that there was error in permitting the

chief of the Amherst fire department to testify that he had examined Rollins's wallet and found that it contained no money. On the first occasion when the chief so testified there was no objection. The theory of the defendant is that this evidence suggested a felony murder. However, the Commonwealth did not so argue and the judge's charge was devoid of such a suggestion. The defendant makes no showing that he was harmed by the admission of this evidence. The wallet was one article among a number found at the scene and the trial judge, who in his sound discretion allowed the testimony, did not err. *Commonwealth* v. *Simpson,* 300 Mass. 45, 57, cert. den. 304 U. S. 565. *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 279, cert. den. 371 U. S. 852. It is to be noted that when the defendant objected, the evidence had already been admitted without objection.

2. Error is alleged in permitting a police officer who attended the autopsy to state that during its course he saw the pathologist fit the hammer found in the defendant's room into indentations in the skull of the deceased. A second police officer later testified without objection along the same lines. The pathologist himself stated that he did not recall employing the hammer during the autopsy. This testimony was simply concerned with observation of a physical act which the jury could believe took place or not as they determined. If at the conclusion of the three witnesses' testimony on this alleged occurrence the defendant had judged it improper on any ground, he might have moved to strike it or request appropriate limiting instructions which he did not choose to do. *Commonwealth* v. *Pinnick,* 354 Mass. 13.

3. The defendant complains that the Commonwealth was allowed to show numerous colored slides of the body of the deceased made during the course of the autopsy. The principal objection to the use of these slides was that the defendant was surprised by the Commonwealth's noncompliance with a previous order of the court. The slides were graphic and even gruesome and what might be ex-

pected from an occurrence as terrible as this. Prior to the display of the slides the judge cautioned the jury to remain calm and thereafter did not admit the slides in evidence. It appears that in a preliminary hearing before another judge, upon the defendant's motion for a bill of particulars, the Commonwealth agreed to furnish to the defendant at his expense copies of all photographs which it claimed relevant to the case. The defendant claims that the photographs were not furnished but upon a voir dire on this point the trial judge found no failure of compliance on the part of the Commonwealth. The voir dire demonstrated that defence counsel knew of the pictures, knew that they would be offered at the trial, and did not thereafter obtain copies. We note that this case produced evidence tending to show a crime of great ferocity and cruelty. We cannot say that the judge abused his discretion any more than we can say that the jury would be further inflamed or excited by seeing the slides than they had been from the evidence which was already before them. *Commonwealth* v. *Gray*, 314 Mass. 96, 97–98. *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 583–584. *Horowitz* v. *Bokron*, 337 Mass. 739, 742–743. The slides were, in addition, a fair representation of what the pathologist encountered as he proceeded in the autopsy.

4. Park testified that after the officer had pulled Rollins from the room, but before the fire was under control, he was asked by the police how many people were in the room and he had answered that there were two. The defendant argues that this was prejudicial hearsay damaging to the defendant, to whom Park obviously referred, as a result of which the police again, at risk of life, entered the room. This, however, seems to us rather to be evidence of attendant circumstances of aid to a jury in affording them a complete picture of a crime prior to their arrival at a verdict. *Commonwealth* v. *Simpson*, 300 Mass. 45, 50, cert. den. 304 U. S. 565. Furthermore, the statement of Park was made at the scene of the crime while events connected with it were transpiring and was of such a nature as to negative contrivance or fabrication. *Correira* v. *Boston Motor Tours, Inc.*

270 Mass. 88, 91. *Commonwealth* v. *Boyajian,* 344 Mass. 44, 47. The circumstances of this case and the context in which the response of Park was made seem to have been such that the broad discretion accorded to the trial judge in ruling on the admissibility of the utterance appears in no way to have been abused. *Rocco* v. *Boston-Leader, Inc.* 340 Mass. 195, 197. If the question should not have been asked, it is not shown to be harmful.

5. The defendant's assignments 6 and 7 question the propriety of permitting the Commonwealth to introduce in evidence a sizeable number of exhibits which were either photographs of items found in the room where the bludgeoning occurred, or the room, or other items themselves, including a bottle of acetone. Relative to this bottle, the defendant contended that it played no part in the fire. While this may be so, that in and of itself constitutes no mandate for exclusion if, as was the case, it is offered in evidence. That the bottle of acetone was not involved in the fire makes no difference. *Commonwealth* v. *O'Toole,* 326 Mass. 35, 39. *Commonwealth* v. *McCambridge,* 351 Mass. 516, 521. See *Commonwealth* v. *Noxon,* 319 Mass. 495, 539–540. As to the balance of the exhibits, some may have proved of consequence and some not. However, in setting the scene by that type of description which the exhibits provided, the trial judge is in the best position to make a fair determination whether any such exhibit is to be admitted or not. *Commonwealth* v. *Simpson,* 300 Mass. 45, 57, cert. den. 304 U. S. 565. See *Commonwealth* v. *McDonald,* 264 Mass. 324. See also *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 470; *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 279, cert. den. 371 U. S. 852.

6. The defendant's assignment 8 is concerned with the testimony of Mrs. Eileen Tarlow, the mother of a girl friend of the defendant. After a voir dire she was permitted to testify that she received a telephone call on March 24, 1967. At this time she talked first with an operator who advised her that the call was from Stephen Murphy, from Richmond, Virginia, for the witness's daugh-

ter. Mrs. Tarlow said she told the operator that her daughter was not at home. She then heard the operator relay this message "immediately" to the defendant whose voice she recognized in the exchange. The defendant argues that it was not shown that he heard the operator tell Mrs. Tarlow that the call had been placed from Richmond. Secondly, he states that the declaration of the operator relative to the origin of the call did not call for an answer from him. The defendant claims that this evidence was harmful in that it indicated flight and an inference of consciousness of guilt. He cites certain cases, and *Commonwealth* v. *Valcourt,* 333 Mass. 706, 713, fn. 1, in particular, as authority for the proposition that his silence on the exchange between the operator and Mrs. Tarlow cannot be construed as an adoptive admission since he was not a part of the exchange. In the circumstances of this case we see no difficulty in admitting the testimony of the witness that she recognized the voice of the defendant. On the basis of prior contacts with the defendant the witness had stated she knew his voice well enough to recognize it. We feel there was sufficient authentication to make her testimony of recognition admissible. *Lord Elec. Co.* v. *Morrill,* 178 Mass. 304, 306. *Bond Pharmacy, Inc.* v. *Cambridge,* 338 Mass. 488, 490–491. *Chartrand* v. *Registrar of Motor Vehicles,* 345 Mass. 321, 325–326. The judge on a voir dire found that this conversation was "intermingled," in other words that the defendant, Mrs. Tarlow and the operator were all participants in it, and allowed admission of the testimony. It was then for the jury to determine whether the defendant heard the operator's announcement of Richmond as the source of the call. *Commonwealth* v. *Hamel,* 264 Mass. 564, 570. *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 583.

Any error was harmless. Early in the morning of March 25 upon his arrival at the Amherst police station following his arrest, the defendant called a fellow student who testified that he recognized the voice of the defendant and asked him where he had been, to which the defendant replied "he headed south." This evidence was cumulative.

7. The defendant's motions for directed verdicts of not guilty on both indictments were properly denied. The circumstances of this crime which have been recited might reasonably impel a jury to find the facts were "incompatible with the innocence of the defendant and not in accord with any other theory than his guilt." *Commonwealth* v. *Francis*, 355 Mass. 108, 109–110, and cases cited. There is most certainly a showing of a reasonable and moral certainty that the accused, and no one else, committed the crimes with which he was charged.

8. There is no merit in the defendant's last assignment of error on the arson indictment relative to the admission of a deed for the purpose of establishing ownership in the premises where the fire took place. *Commonwealth* v. *Mead*, 153 Mass. 284.

Consonant with our duty under G. L. c. 278, § 33E, as amended through St. 1962, c. 453, we have carefully reviewed the evidence and are of the opinion that justice does not require the entry of a verdict of lesser degree of guilt than that returned by the jury, or that there be a new trial.

*Judgments affirmed.*